UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

PATRICK JAMES WERNER,

        Plaintiff,

        v.                             Case No. 12-C-0096

EDWARD F. WALL,
AMANDA MARTIN,
LORI RICHGELS,
ROSE SNYDER-SPAAR,
DENISE SYMDON,
ERIN MURTO,
TOM WICKENAM, and
ROBERT FUSFELD,

        Defendants.

DECISION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DOC. 87), DENYING PLAINTIFF'S MOTION TO ORDER PSYCHOLOGICAL EXAM (DOC. 98), DENYING AS MOOT PLAINTIFF'S MOTION FOR LEAVE TO FILE EXCESS PAGES (DOC. 100), DENYING AS MOOT DEFENDANTS' MOTION TO STRIKE PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DOC. 103), DENYING WITHOUT PREJUDICE PLAINTIFF'S MOTION TO APPOINT COUNSEL (DOC. 104), DENYING AS MOOT PLAINTIFF'S MOTION FOR ORDER TO COMBINE REQUEST FOR ADMISSION WITH MOTION FOR SUMMARY JUDGMENT (DOC. 104), DENYING AS MOOT PLAINTIFF'S MOTION FOR COURT TO REVIEW MOTIONS AND DOCKET (DOC. 107), GRANTING PLAINTIFF'S MOTION TO FILE LATE SUMMARY JUDGMENT MOTION (DOC. 108), GRANTING PLAINTIFF'S MOTION FOR LEAVE TO FILE BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT (DOC. 111), GRANTING PLAINTIFF'S MOTION FOR LEAVE TO FILE EXCESS PAGES (DOC. 112), GRANTING PLAINTIFF'S MOTION TO ALLOW TABLE OF CONTENTS (DOC. 114), DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (DOC. 111-1), AND DISMISSING CASE

Plaintiff is proceeding pro se on the following claims: (1) Eighth Amendment claims against defendants Martin, Richgels, Fusfeld, Murto, and Wickenam that plaintiff was incarcerated after his mandatory release date; (2) due process claims against defendants

Martin, Richgels, Fusfeld, Murto, and Wickenam that plaintiff was confined at the Brown County Jail without due process; and (3) a claim against each defendant in his or her official capacity that Administrative Directive #02-10 violated plaintiff's rights under the due process clause and the ex post facto clause.

The court previously issued an order resolving motions defendants filed with their motion for summary judgment and addressing the motion for summary judgment plaintiff filed in August. In the course of supplementing his motion for summary judgment and responding to defendants motion for summary judgment, plaintiff has filed a myriad of documents. Most of the motions plaintiff filed are now moot, as is defendants' motion to strike plaintiff's response to their motion for summary judgment. However, the court has considered the documents plaintiff filed on November 20, 2013, and has construed them as a motion for summary judgment as well as a response in opposition to defendants' motion for summary judgment. Now before the court are the parties' motions for summary judgment.

## SUMMARY JUDGMENT STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *Ames v. Home Depot U.S.A., Inc.*, 629 F.3d 665, 668 (7th Cir. 2011). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *See Anderson*, 477 U.S. at 248. A dispute over "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: "(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

## BACKGROUND

Defendants are all employees of the Wisconsin Department of Corrections (DOC) Division of Community Corrections (DCC), with the exception of defendant Edward F. Wall, who is the Secretary of the DOC.

Because plaintiff was convicted of two or more sexual assaults, he was considered a Special Bulletin Notice (SBN) sex offender, which means that the DCC must give notice to law enforcement in the community to which plaintiff was released. *See* Wis. Stat. § 301.46(2m)(am). It also means that plaintiff had to be placed in Brown County initially upon his release, because that was where he was convicted. *See* Wis. Stat. § 301.03(20)(a).

At the time of plaintiff's release, there were approximately fourteen sex offender ordinances in Brown County. These ordinances placed severe restrictions on where registered sex offenders could live which made it very difficult to find appropriate housing

3

for sex offenders in Brown County at the time of plaintiff's release. For example, Green Bay DCC had one Transitional Living Program (TLP) which, at the time of plaintiff's release, was too close to a park, according to the ordinances. Therefore, sex offenders had to appear before the City of Green Bay Sex Offender Appeals Board to receive an exemption or permission to live at the TLP. Offenders could sometimes rent motel rooms, but motel owners were reluctant to rent to sex offenders and many motels were not in compliance with the ordinances.

The sex offender ordinances in Brown County place a number of administrative and financial burdens on the DOC. Due to restrictions, agents and supervisors must spend extra time and money searching for ordinance-compliant housing for offenders under their supervision. The DOC also must spend extra time and money with the chaperone service that is used to help offenders search for housing.

The DOC has no interest in detaining homeless SBN sex offenders any longer than necessary because of the administrative and financial burdens of such detentions. Housing homeless SBN sex offenders in the Brown County Jail is expensive, and the DOC reimburses the jail at an annual rate.

Plaintiff was under the supervision of the DCC from November 3, 2009, until February 9, 2011. Defendant Amanda Martin began supervising plaintiff in 2009, while plaintiff was still incarcerated at Redgranite Correctional Institution (RGCI). Plaintiff's former parole agent had completed a SBN Release Plan which proposed that plaintiff reside at a TLP in the City of Milwaukee if he was released on parole. But the DOC DCC Administrator at the time denied this request.

However, plaintiff's request to move to a TLP in Green Bay also was denied by the Green Bay Sex Offender Residence Board. Sex Offenders seeking residence in the City of Green Bay were required to obtain preapproval from the Green Bay Sex Offender Residence Board. Martin asked plaintiff to forward to her any other proposed residence plans. On November 13, 2009, plaintiff was denied release on parole, and he was deferred until his Mandatory Release date of March 21, 2010.

On November 16, 2009, Martin had an e-mail exchange with plaintiff's social worker at RGCI. Plaintiff was concerned about where he would live when he was released and requested a telephone call with Martin to address these concerns. Martin scheduled a telephone conference for December 1, 2009, and requested that plaintiff have a list of proposed residences ready to discuss and, if the residences were within Green Bay, he needed to contact the residency board for prior approval. If not, they would need to be submitted to the DOC to have a residency investigation completed. Finally, Martin advised plaintiff that, according to the DOC administrative directive, if plaintiff had no approved residence to be released to, he would be placed in custody at the Brown County Jail and thereafter released to conduct a residency search. Martin also reminded the social worker to advise plaintiff that he could always petition not to be released from the institution. Prior to the conference call, Martin met with her supervisor, Lori Richgels, to discuss the procedure for institution releases of homeless SBN sex offenders in Brown County.

On December 1, 2009, Martin held a telephone conference with plaintiff and Martin discussed the Brown County ordinances. He spoke of housing and employment possibilities and said that if plaintiff did not have an approved residence, he would be

5

permitted to search for housing with a chaperone during the day and required to return to the Brown County Jail at night until an approved residence was found. Martin also explained that plaintiff would be on lifetime GPS tracking.

At that time, the GPS worked through the offender's residence landline. The offender carried the GPS tracker while out and plugged the tracker into the residential landline docking station after returning, thereby notifying DCC staff that he was home. Electronic monitoring worked in much the same way and also required a landline at that time.

Prior to plaintiff's release, Martin investigated numerous potential residences proposed by plaintiff, his social worker, or mother. None was appropriate. Martin encouraged plaintiff to continue looking and proposing places thereby increasing his changes of obtaining a residence upon his release to the community. Prior to plaintiff's release, Martin secured a chaperone to assist his search for housing upon his release.

On February 11, 2010, the DCC issued the SBN and Notification Supplement to law enforcement agencies in plaintiff's planned areas of residence, employment, and/or school enrollment. Martin and Richgels had a CORE meeting with the Brown County Sheriff's Department, the Ashwaubenon Police Department, the DePere Police Department, the Green Bay Police Department, and Tom Smith from the DOC on March 4, 2010, regarding plaintiff and other SBN sex offenders who were scheduled to be released around the same time. A CORE meeting convenes with law enforcement, victim/witness advocates, the District Attorney's office, and Probation and Parole Agents approximately one month before the release of sex offenders to discuss their cases along with their release plans and to determine the level of community notification.

6

On March 16, 2010, plaintiff was released from RGCI to the DCC office in Green Bay. Martin completed the intake process with plaintiff, including reviewing the process for mandatory GPS, reviewing the sex offender registry requirements, reviewing and signing the Rules of Community Supervision and Standard Sex Offender Rules, and reviewing the procedures for sex offender housing searches. A chaperone was present, and plaintiff reviewed and signed the paperwork regarding his chaperone services too.

At 2:00 p.m. on March 16, 2010, after plaintiff had spent approximately four hours at the DCC office, plaintiff was booked into the Brown County Jail. At that time, he had not secured an approved residence, and the DCC had no alternative housing resources in the community. Therefore, Martin detained plaintiff in the Brown County Jail to prevent a violation of his rules of supervision. Martin explained to plaintiff that he was being detained because he was a homeless SBN sex offender, and an approved residence was one of the requirements of his Rules of Supervision. Moreover, he advised that plaintiff needed a residence because he was required to be on lifetime GPS, which required a telephone landline. Martin also informed plaintiff that he would be detained at the Brown County Jail at night, but that he would be released to a chaperone during the day to look for housing.

If SBN sex offenders do not have an approved residence at the time of their release from prison, agents are directed to detain them to prevent a possible violation pursuant to Wis. Admin. Code § DOC 328.22(2)(d) (Dec. 2006). Protection of the public is the primary purpose of Administrative Directive #02-10, Procedures for SBN Offenders Lacking Approved Residences.

Every weekday, plaintiff and several other homeless SBN sex offenders were released from the jail to search for housing with chaperones for four hours. Chaperones drove the offenders around to look for appropriate housing and supervised the offenders at DCC offices while the offenders made calls to potential landlords. At the end of the four hours, an agent met the offender and the chaperone at the jail to book the offender back into jail. Agents met with offenders to follow up on calls, check ordinances, and to check Mapquest and maps in the office for potential housing. If Martin had concerns about a possible density problem, she would consult the Sex Offender Registry Program (SORP) website to see the number of sex offenders in a particular zip code area. She would also drive to an area to verify the address and survey the neighborhood to address further questions. In addition, Martin often discussed plaintiff's housing proposals and progress with her supervisor.

Werner and the other sex offenders maintained a fairly high level of independence. If they were with a chaperone, they could be out in the community, searching for housing or attending to other appointments or errands as necessary. While at the DCC offices, offenders were allowed to talk with other offenders or read magazines and newspapers during free time. Offenders were permitted to make personal calls on DCC telephones, with prior agent approval, and wear street clothes while they were released from jail during the day. Plaintiff was permitted to go to his mother's house with a chaperone to visit, to change clothes, and to obtain money and food.

While plaintiff was held as a homeless SBN sex offender, Martin continued to investigate numerous potential residences for him. However, these residences were

8

determined to be inappropriate for plaintiff or landlords refused to rent to plaintiff after learning that he is a registered sex offender.

In October 2010, plaintiff violated the terms of his supervision. On October 19, 2010, he was provided with a Notice of Violation, Recommended Action, Statement of Hearing Rights, and Receipt. Martin indicated that between October 1, 2010, and October 4, 2010, plaintiff was in possession of contraband in the form of paperclips at the Brown County Jail and that he made threatening comments to his fellow pod mates. On October 28, 2010, plaintiff signed an Alternative to Revocation Agreement (ATR) and plaintiff agreed to stay at one of the Division of Adult Institutions facilities, Columbia Correctional Institution (CCI), for 90 days. On December 1, 2010, Martin and Sergeant Stanley transported plaintiff from the Brown County Jail to CCI to being serving his 90 day ATR.

On February 7, 2011, plaintiff's parole case was transferred to defendant agent Robert Fusfeld. In anticipation of plaintiff's release from CCI, Fusfeld arranged for a chaperone to transport plaintiff to locate housing and to supervise him at the job center computers, which he could use for residence and job searches. On February 18, 2011, Fusfeld contacted plaintiff's prison social worker and advised her that on plaintiff's release date, he would be released to Fusfeld's custody at the DCC offices and then transported to the Brown County Jail. Fusfeld also conducted a telephone conference with plaintiff and his mother on February 22, 2011. Plaintiff could not reside with his mother because of her roommate and the size of their apartment, but she would be able to financially assist plaintiff with up to $500.00 per month for rent if a residence that satisfied the ordinance restrictions could be located.

On February 23, 2011, Fusfeld forwarded plaintiff's Rules of Supervision to his social worker and asked her to have plaintiff sign and return the rules prior to his release date. On February 24, 2011, Fusfeld had another telephone conference with plaintiff and discussed the Brown County ordinances. Fusfeld advised plaintiff that he would go to the Brown County Jail at night until he could find an approved residence.

On March 1, 2011, plaintiff was released from CCI to the DCC office in Green Bay. Fusfeld and plaintiff reviewed his plan and signed the chaperone agreement. Later that day, plaintiff was booked into the Brown County Jail because he had not secured an approved residence and the department had no alternative housing resources in the community.

On June 1, 2011, plaintiff found a tentative residence on Manitowoc Road in Bellevue, Wisconsin. Fusfeld contacted the landlord, and she agreed to have plaintiff as a tenant. Fusfeld contacted plaintiff's mother and informed her that he had approved the residence. Fusfeld began arrangements for community notification, GPS, telephone, and monthly rent assistance. On June 23, 2011, plaintiff's supervision was transferred to another agent due to Fusfeld's retirement.

Plaintiff's new agent was defendant Erin Murto. She continued to arrange for community notifications, GPS, telephone, and rent and moving assistance. On July 1, 2011, plaintiff moved into his new residence, and he was hooked up on GPS. He subsequently found employment.

In November 2011, plaintiff violated the terms of his supervision. He was apprehended and detained at the Brown County Jail. Revocation was recommended because plaintiff admitted to engaging in conversations on a telephone chat line,

establishing a casual relationship with a 21 year old female without his agent's knowledge or approval and engaging in sexual intercourse at his residence with a female he met on the chat line. A revocation hearing was held at the Brown County Jail on April 11, 2012, and plaintiff's parole was revoked.

On November 16, 2012, plaintiff was again released to community supervision and placed at the TLP in Green Bay due to his status as a homeless sex offender. As of August 25, 2012, the City of Green Bay implemented revised stipulations to their ordinances allowing for registered sex offenders, like plaintiff, to move directly to a TLP in Green Bay without prior approval from the appeals board. Plaintiff was placed on GPS, enrolled in Sex Offender Treatment, and reported weekly to his agent's office. On February 15, 2013, plaintiff again violated the conditions of his supervision and was placed in custody at the Brown County Jail. Revocation was recommended.

If plaintiff's probation is not revoked for violating conditions of his supervision, and he is released back to probation, Administrative Directive #02-10 would not apply to him as a probationer and DCC could release him as a homeless sex offender. If plaintiff's probation is revoked and he goes back to prison and is later released to supervision, Administrative Directive #02-10 would apply to him. However, due to the recent change in the Green Bay ordinances, DCC would be able to place him at the TLP or a motel in Green Bay until permanent housing could be located.

DISCUSSION

Defendants contend that (1) they are shielded from damage liability because they are entitled to qualified immunity; (2) plaintiff's claims for injunctive relief are moot because he is no longer a homeless sex offender; (3) plaintiff should have brought this

11

motion as a petition for a writ of habeas corpus; (4) plaintiff's due process rights were not violated when he was detained as a homeless sex offender pursuant to AD #02-10; (5) defendants did not violate plaintiff's Eighth Amendment rights, even if the Eighth Amendment applies to this case; (6) defendants did not violate plaintiff's rights under the ex post facto clause, even if it applies to this case; and (7) plaintiff is limited to only nominal damages.

In his motion for summary judgment, plaintiff makes numerous arguments. However, he has not limited his motion to the issues in this case. He responds to the arguments in defendants' motion for summary judgment, but also presents evidence and arguments regarding jail boarding fees imposed by the Brown County Jail, the GPS registration fee, his mental health issues, a possible claim under the Americans with Disabilities Act, and a claim that defendants did not comply with the language of AD #02-10, requiring unfettered search for housing. Plaintiff also raises numerous claims against Martin, including that she failed to diligently perform her duty to assist his search for housing, she failed to follow the instructions of her supervisor, she failed to follow proper procedures after his mother submitted an e-mail complaint about her actions, and she perjured herself in her interrogatory responses. None of these issues is part of this case, which touches on the constitutionality AD #02-10.

Turning to the issue of qualified immunity, the Supreme Court of the United States has articulated a two-part test: (1) whether the facts, taken in the light most favorable to the plaintiff, show that the defendants violated a constitutional right; and (2) whether the constitutional right was clearly established at the time of the alleged violation. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). Qualified immunity is an affirmative defense. Once

raised, a plaintiff must demonstrate that the constitutional right was clearly established by showing that there is "a clearly analogous case establishing a right to be free from the specific conduct at issue" or that "the conduct is so egregious that no reasonable person could have believed that it would not violate clearly established rights. *Chelios v. Heavener*, 520 F.3d 678, 691 (7th Cir. 2008).

The Supreme Court revisited *Saucier* and held that "because the two-step *Saucier* procedure is often, but not always, advantageous, the judges of the district courts and the courts of appeals are in the best position to determine the order of decision [that] will best facilitate the fair and efficient disposition of each case." *Pearson v. Callahan*, 555 U.S. 223, 129 S.Ct. 808, 821 (2009). In this case, the court will exercise the option provided by *Pearson* and consider first whether the constitutional right plaintiff asserts was violated was clearly established at the time of the alleged violation.

The court must grant defendants' motion for summary judgment if it finds that the constitutional right defendants allegedly violated was not clearly established at the time of the purported misconduct. *Lewis v. Downey*, 581 F.3d 467, 478 (7th Cir. 2009). To remove the shield of qualified immunity from defendants, the right that they "allegedly violated must be clearly established in a particularized sense." *Id.* (omitting internal quotations). The court must assess whether, operating under the state of the law as it existed at the time of the relevant events, "a reasonable officer would have known that the particular action at issue ... was unlawful." *Id.* at 479 (quoting *Juriss v. McGowan*, 957 F.2d 345, 350 (7th Cir. 1992)).

Here, defendants were working diligently in a challenging situation. They could not, under the line of Wisconsin state cases, retain plaintiff at a DOC institution after his mandatory release date. However, the ordinances in Brown County made it extremely difficult to find appropriate housing for SBN sex offenders. Defendants could not allow plaintiff to be homeless because that would violate his rules of supervision and subject him to revocation. The policy set forth in Administrative Directive #02-10 was an attempt to allow SBN sex offenders to be released from prison, provide them with a place to stay, and avoid violation of their rules of supervision while the offenders were searching for appropriate housing. In 2010 and 2011 there was no case law that suggested this solution violated the SBN sex offenders' constitutional rights.

In *Metcalf v. Donalds*, No. 10-C-0615, 2012 WL 2050823 (E.D. Wis. June 7, 2012), the court concluded that the question of whether due process required a hearing in addition to or in lieu of the process available under Wis. Admin. Code § DOC 328.11 was novel and therefore defendants in that case were protected by qualified immunity from liability for damages. In *Metcalf*, the court framed the due process question in terms of the statute that establishes a complaint process that may be used by any client to "review a decision which affects the client personally." Wis. Admin. Code § 328.11(3). In this case, the issue is framed as the constitutionality of AD #02-10. Nevertheless, both cases address the procedure for handling sex offenders who have not located appropriate housing by the date of their release. Plaintiff attempts to distinguish *Metcalf* with small factual differences, such as the DCC providing Metcalf with a cell phone and allowing him to call landlords from the lobby of the DCC's offices until 5:00 p.m. each day. These

14

differences do not affect the conclusion regarding qualified immunity, which this court would have reached even without *Metcalf*.

Unlike *Metcalf*, though, plaintiff here has state-wide defendants and a facial challenge to AD #02-10. Therefore, after determining that defendants are entitled to qualified immunity on plaintiff's individual constitutional claims, the court must consider plaintiff's official capacity claims that AD #02-10 violated his rights under the due process clause and the ex post facto clause. These claims are for injunctive relief only. *See Brown v. Budz*, 398 F.3d 904, 917-18 (7th Cir. 2005).

Plaintiff's claims for injunctive relief are moot because he is no longer being housed at the Brown County Jail as a homeless SBN sex offender. *See Maddox v. Love*, 655 F.3d 709, 716 (7th Cir. 2011); *see also Ortiz v. Downey*, 561 F.3d 664, 668 (7th Cir. 2009). Plaintiff has not shown a realistic possibility that he will again be housed at the Brown County Jail as a homeless SBN sex offender. As such, "[a]ny relief that our judgment might permit would be purely speculative in nature." *See id.*

Defendants have presented evidence that even if plaintiff's probation is revoked and he is sent to prison and then released to supervision, he would not be held at the Brown County Jail because a recent change in the Green Bay ordinance allows the DCC to place plaintiff at the TLP or in a motel in Green Bay until permanent housing could be located. Plaintiff anticipated this argument and averred that he has sufficient reason to fear that the law will be applied to him in the future. He contends that since the creation of the Green Bay Sex Offender Residency Ordinance there have been various add-ons nearly every year thereby making it impossible to know "what tomorrow will bring with this

issue." (Doc. 111-1, p. 76). Plaintiff's generalized fear of the ordinance changing is not enough to overcome the evidence presented by defendants regarding how plaintiff may be treated under current law. The court cannot determine that a policy is unconstitutional based on what the law may someday be.

As a final matter, plaintiff has filed motions asking for psychological examination (Doc. 98) and seeking the appointment of counsel (Doc. 104). The central claim in this case does not involve plaintiff's mental health, and neither a psychological examination nor plaintiff's psychiatric records are required to resolve this case. There was also no need to request pro bono counsel to represent plaintiff, as his claims have been clearly stated. Even with counsel, defendants would be entitled to qualified immunity and plaintiff would not be entitled to injunctive relief. Therefore,

IT IS ORDERED that defendants' motion for summary judgment (Doc. 87) is GRANTED.

IT IS FURTHER ORDERED that plaintiff's motion to order psychological exam (Doc. 98) is DENIED.

IT IS FURTHER ORDERED that plaintiff's motion for leave to file excess pages (Doc. 100) is DENIED AS MOOT.

IT IS FURTHER ORDERED that defendants' motion to strike plaintiff's response to defendants' motion for summary judgment (Doc. 103) is DENIED AS MOOT.

IT IS FURTHER ORDERED that plaintiff's motion to appoint counsel (Doc. 104) is DENIED WITHOUT PREJUDICE.

IT IS FURTHER ORDERED that plaintiff's motion for order to combine request for admission with motion for summary judgment (Doc. 104) is DENIED AS MOOT.

IT IS FURTHER ORDERED that plaintiff's motion for court to review motions and docket (Doc. 107) is DENIED AS MOOT.

IT IS FURTHER ORDERED that plaintiff's motion to file late summary judgment motion (Doc. 108) is GRANTED.

IT IS FURTHER ORDERED that plaintiff's motion for leave to file brief in support of motion for summary judgment (Doc. 111) is GRANTED.

IT IS FURTHER ORDERED that plaintiff's motion for leave to file excess pages (Doc. 112) is GRANTED.

IT IS FURTHER ORDERED that plaintiff's motion to allow table of contents (Doc. 114) is GRANTED.

IT IS FURTHER ORDERED that plaintiff's motion for summary judgment (Doc. 111-1) is DENIED.

IT IS FURTHER ORDERED that this case is DISMISSED.

Dated at Milwaukee, Wisconsin, this 27th day of March, 2014.

BY THE COURT

/s/ C.N. Clevert, Jr.
C.N. CLEVERT, JR.
U.S. District Judge